1   PHILLIP A. TALBERT
    United States Attorney
2   SAM STEFANKI
    Assistant United States Attorney
3   501 I Street, Suite 10-100
    Sacramento, CA 95814
4   Telephone: (916) 554-2700
    Facsimile: (916) 554-2900
5

6   Attorneys for Plaintiff
    United States of America
7

8              IN THE UNITED STATES DISTRICT COURT

9              EASTERN DISTRICT OF CALIFORNIA

10  UNITED STATES OF AMERICA,          CASE NO. 2:19-CR-00043-TLN

11                      Plaintiff,     RESPONSE TO DEFENDANT'S OBJECTIONS TO
                                       PRESENTENCE REPORT; SENTENCING
12           v.                        MEMORANDUM

13  DAVID LEE WHITE,                   DATE: February 17, 2022
                                       TIME: 9:30 a.m.
14                      Defendant.     COURT: Hon. Troy L. Nunley

15

16          The Court should overrule defendant David White's objections to the presentence report and

17  sentence him to 135 months in prison. White's objections to the presentence report are unfounded. His

18  conduct in this case is serious, involving the distribution throughout the country of large quantities of

19  heroin, cocaine, and methamphetamine as part of a dark web conspiracy known as "TheSickness." His

20  criminal history is substantial and shows White to be a dangerous person whose criminal tendencies

21  were not blunted by his past brushes with the law. A sentence of 135 months in prison would satisfy the

22  federal sentencing criteria by accounting for the nature and circumstances of White's offense, his

23  concerning history and characteristics, and the need to protect the public from further crimes he may

24  commit.

25  **I.    RESPONSE TO WHITE'S OBJECTIONS TO THE PRESENTENCE REPORT**

26          White's objections to the presentence report (the "PSR") prepared by Senior United States

27  Probation Officer Nisha Modica are without merit. The Court should overrule each of these objections

28  because the evidence shows that the presentence report is correct. *See* Fed. R. Crim. P. 32(i)(3)(B).

**A.** **The Firearm Found in White's Motel Room Was Connected to His Offense of Distributing Large Amounts of Narcotics.**

The PSR added two levels to White's offense level because when law enforcement agents executed a search warrant at his motel room, they recovered a large amount of illegal narcotics and also "confiscated a loaded and unregistered Kel-Tec nine-millimeter handgun." PSR ¶ 28, ECF No. 183. White objects to this specific offense characteristic because he claims there was no connection between that firearm and his offense of distributing heroin, cocaine, and methamphetamine, even though law enforcement found the firearm in the same room as that menu of illegal narcotics. Def.'s Objs. at 1–2, ECF No. 186.

1.     The Guidelines Require Only Constructive Firearm Possession.

"Under § 2D1.1(b)(1), '[i]f a dangerous weapon (including a firearm) was possessed,' a two-level enhancement is applicable." *United States v. Gomez*, 6 F.4th 992, 1008 (9th Cir. 2021) (quoting U.S. Sent'g Guidelines Manual § 2D1.1(b)(1) (U.S. Sent'g Comm'n 2016) [hereinafter U.S.S.G.]). The Ninth Circuit interprets this enhancement broadly. *Id.* Indeed, "[t]he enhancement should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." *Id.* (quoting U.S.S.G. § 2D1.1(b)(1) cmt. n.11(A)); *see United States v. Restrepo*, 884 F.2d 1294, 1296 (9th Cir. 1989) ("[I]n applying § 2D1.1(b)(1), the court need not find a *connection* between the firearm and the offense. If it finds that the defendant *possessed* the weapon during the commission of the offense, the enhancement is appropriate.").

In this context, "possession of the firearm may be actual or constructive." *Gomez*, 6 F.4th at 1008 (citing *United States v. Lopez-Sandoval*, 146 F.3d 712, 714–15 (9th Cir. 1998)). The government bears the burden to prove constructive possession of a firearm by a preponderance of the evidence. *United States v. Baldon*, 956 F.3d 1115, 1127 (9th Cir. 2020). However, "the firearms and drugs need not 'be found in proximity to each other.'" *Gomez*, 6 F.4th at 1008 (quoting *United States v. Willard*, 919 F.2d 606, 610 (9th Cir. 1990)). "Even when defendants were arrested miles away from the firearms stored at their homes or places of business, [the Ninth Circuit has] held that the defendants possessed weapons during the commission of the drug-trafficking offenses for purposes of this sentencing enhancement." *Id.* (citing *Lopez-Sandoval*, 146 F.3d at 715; *United States v. Stewart*, 926 F.2d 899,

901–02 (9th Cir. 1991)); *see United States v. Heldberg*, 907 F.2d 91, 94 (9th Cir. 1990) (upholding application of enhancement where "the firearm was a few feet away and readily accessible to [the defendant] during the importation of controlled substances in the event he desired to use it to commit an act of violence"). Indeed, "[t]he proximity of guns and drugs is usually circumstantial evidence of possession during the commission of a drug offense." *United States v. Willard*, 919 F.2d 606, 610 (9th Cir. 1990). A loaded firearm is also more likely to be connected to the offense. *Cf. Gomez*, 6 F.4th at 1009 ("We have also held that the fact that a firearm was unloaded does not make it 'clearly improbable that the weapon was connected to' the drug offense.").

### 2. White Constructively Possessed the Firearm Found in His Motel Room.

Law enforcement located the firearm in question in a nightstand next to one of two beds in the single motel room that White shared with his codefendant Alicia McCoy. Ex. 1 at 16 (containing log of items seized from White's motel room indicating that firearm was located in Room C); Ex. 2 (containing room schematic created by law enforcement agents upon service of search warrant demonstrating location of Room C).[1] The layout of the motel room—with no walls separating the living areas and with narcotics, ammunition, and other drug paraphernalia distributed throughout the space—makes it clear that White had ready access to both the firearm and the narcotics he was distributing. *See* Ex. 3 (depicting duffle bag full of drug orders recovered in same motel room as firearm). These facts alone are sufficient to establish that White constructively possessed the firearm. *See United States v. Eggleston*, 453 F. App'x 675, 677 (9th Cir. 2011) (holding that evidence defendant "possessed the firearm on the same day and at the same house in which he possessed crack cocaine . . . easily satisfies the broad definition of 'possession' in our Circuit" for application of U.S.S.G. § 2D1.1(b)(1)).

Furthermore, and despite his claims to the contrary, White constructively possessed the Kel-Tec pistol because he had recently bought it. *Cf. United States v. Kelso*, 942 F.2d 680, 682 (9th Cir. 1991) (declining to find constructive possession of firearm because there was no evidence the defendant owned it or was aware of its presence). Agents executing a search warrant in White's motel room recovered a receipt for the firearm's purchase. Ex. 4 (containing receipt recovered during search warrant execution).

---

[1] All government exhibits referenced in this filing were previously produced to White's counsel in discovery.

This receipt revealed that someone using the name "Jordan John Watkins" purchased the Kel-Tec from a firearms dealer in Tempe, Arizona, on December 4, 2018. Ex. 4 at 2. The firearm was purchased using a Visa debit card with the last four digits 2932. Ex. 4 at 3. In the same motel room, agents also recovered a bank statement in White's name for a platinum debit card ending in 2932. Ex. 5. This evidence makes clear that White constructively possessed the Kel-Tec, because he used a debit card in his own name to purchase the very firearm that he now claims belonged solely to McCoy. *Cf. United States v. Cazares*, 121 F.3d 1241, 1245 (9th Cir. 1997) (noting uncertainty whether defendant possessed firearm found in his apartment because there was no evidence of firearm's ownership).

Another factor weighing in favor of the PSR's application of U.S.S.G. § 2D1.1(b)(1) is that the firearm was unregistered. *See* Plea Agreement at 10. Had the firearm been in White's motel room solely for McCoy's personal protection, it should have been registered in her name since she presumably could possess a firearm legally. *See* Def.'s Objs. at 2 (asserting that "McCoy owned the gun for her personal protection"). White, on the other hand, was a convicted felon recently released from Arizona prison. Def.'s Objs. at 1 ("Mr. White had recently been released from a lengthy prison term."). Indeed, at least two of his prior convictions involved firearms. PSR ¶¶ 43, 45. As such, even though White's criminal history makes it clear that he is familiar with guns, he could not lawfully register the Kel-Tec in his own name. *See* 18 U.S.C. § 922(g). Since the gun was not registered in February despite having been purchased the prior December, this makes it more likely that the gun belonged to the convicted felon in the motel room who could not legally possess it and who has a history of firearm involvement— White. *See Willard*, 919 F.2d at 610 (stating that "[a]ny other evidence may suffice" to demonstrate constructive possession of firearm "as long as it is of a sufficient weight to show that the defendant possessed the guns during the commission of the offense").

3.    The Proximity Between Gun and Drugs Supports the Enhancement.

Since the evidence demonstrates that White constructively possessed the firearm found in his motel room, it is White's burden to show that it is clearly improbable that the weapon was connected with his offense. *Gomez*, 6 F.4th at 1008. White fails to meet this burden.

Law enforcement found a loaded firearm in the same space—a single motel room—from which they recovered 315 grams of heroin, 45 grams of cocaine, 593 grams of methamphetamine, and 30

grams of marijuana. Plea Agreement at 10, ECF No. 169. In his plea agreement, White admitted that he and his co-defendant McCoy were staying in this motel room and using it to distribute the illegal drugs agents seized inside that room. Plea Agreement at 10 ("The defendant agrees that these controlled substances were in his motel room for the purpose of sale and distribution using the dark web accounts he controlled and to which he and/or his codefendants had access."). While it is not necessary for the firearm to be in close proximity to the drugs in order for the enhancement under U.S.S.G. § 2D1.1(b)(1) to apply, the gun and drugs in this case were, in fact, in close proximity to each other. *Baldon*, 956 F.3d at 1127. This weighs in favor of enhancing White's offense level under U.S.S.G. § 2D1.1(b)(1). The same is true for the fact that the Kel-Tec was loaded. *Cf. Gomez*, 6 F.4th at 1009.

## B.     The PSR Properly Enhanced White's Offense Level Under U.S.S.G. § 2D1.1(b)(7).

The PSR applied a two-level enhancement to White's offense level for mass-marketing drugs by means of an interactive computer service, because White's co-defendants sold drugs on various dark web sites. PSR ¶ 29. White objects to this enhancement because he contends that only White's co-defendant Jason Arnold, and neither White nor McCoy, actually maintained the dark web vendor accounts through which the conspiracy sold narcotics. Def.'s Objs. at 2–5.

The Court should overrule White's objection for at least two reasons. First, it is immaterial whether White or McCoy knew how to operate the conspiracy's dark web vendor accounts because those accounts' use was a reasonably foreseeable component of the operation. Second, the evidence shows that both White and McCoy did, in fact, manage the dark web vendor accounts for the conspiracy.

### 1.     U.S.S.G. § 2D1.1(b)(7) Applies Where Online Mass-Marketing Is Reasonably Foreseeable and Within the Scope of Jointly Undertaken Criminal Activity.

The Guidelines explicitly state that two levels should be added to a defendant's offense level if "the defendant, or a person for whose conduct the defendant is accountable under § 1B1.3 (Relevant Conduct), distributed a controlled substance through mass-marketing by means of an interactive computer service." U.S.S.G. § 2D1.1(b)(7). Section 1B1.3, in turn, makes a defendant liable for the relevant conduct of other members of a jointly undertaken criminal activity where that conduct is "within the scope of the jointly undertaken criminal activity," "in furtherance of that criminal activity," and "reasonably foreseeable in connection with that criminal activity." U.S.S.G. § 1B1.3(a)(1)(B).

### 2.   The Conspiracy's Use of the Dark Web Is Relevant Conduct for White.

There is no dispute that White's then-friend and co-defendant, Arnold, made extensive use of the dark web to sell heroin, cocaine, and methamphetamine. Def.'s Objs. at 4. The factual basis to White's plea agreement indicates that White himself, and White's girlfriend McCoy, did the same thing. Plea Agreement at 10 ("Specifically, the defendant and co-defendants Jason Arnold and Alicia McCoy operated the vendor account SICKNESSVERSION2 and 23MIGHTYMOUSE23 on the dark web marketplace known as Dream."). Hence, based on the language in the factual basis White adopted during his plea colloquy, it is clear that using the internet to market drugs was within the scope of the criminal activity that he, Arnold, and McCoy undertook together. *See* U.S.S.G. § 1B1.3(a)(1)(B).

It is also clear that using the dark web to market drugs was in furtherance of, and reasonably foreseeable in connection with, this jointly undertaken criminal activity. U.S.S.G. § 1B1.3(a)(1)(B). White does not dispute that selling drugs was the object of the conspiracy of which he, Arnold, and McCoy were a part. Plea Agreement at 10 ("The defendant agrees that these controlled substances were in his motel room for the purpose of sale and distribution using the dark web vendor accounts he and/or his codefendants controlled and to which he and/or his codefendants had access."). The conspiracy's drugs also clearly had to be delivered somewhere and to someone, and White knew they were being sold to purchasers around the country because he was the person putting those drugs in the mail. PSR ¶ 16 (describing White's admission to law enforcement that he "mailed narcotics to dark web customers on behalf of the conspiracy"); Exs. 8–10 (containing customer purchase information and shipping addresses). White was also living with McCoy, who admitted that she knew "how to do everything with the computers." Def.'s Objs. at 3. And those computers were found in the same motel room where White was residing with McCoy. Ex. 1 (listing laptops recovered during execution of search warrant at motel room). There could be no other explanation for how this conspiracy operated than for it to use the internet: the conspirators could not have been advertising drugs in newspapers, nor could they have been conducting hand-to-hand transactions in numerous states at the same time, nor could they plausibly have been running a drug telemarketing service into multiple states over the phone. For this reason, it was reasonably foreseeable that the internet would be used to market the drugs White was mailing, regardless of whether White himself knew how to accomplish the online marketing on his own.

Additionally, White told law enforcement that McCoy directly accessed the trio's dark web vendor accounts because White was not technically savvy. PSR ¶ 16. This statement makes it clear that White actually knew the internet was being used to market the drugs he was mailing. PSR ¶ 16 ("White admitted that he and McCoy worked with Arnold to distribute narcotics that were sold on the dark web, specifically that they mailed narcotics to dark web customers on behalf of the conspiracy."). This fact was more than just foreseeable—White subjectively knew it. The conspiracy's use of the dark web to market drugs is, therefore, White's relevant conduct under the Guidelines regardless of which member of the trio was actually pressing keys on a keyboard. *See* U.S.S.G. § 1B1.3(a)(1)(B).

Finally, there is direct evidence that White himself had access to the conspiracy's dark web vendor accounts. *See* PSR ¶ 20 ("Arnold taught White how to take and process orders over the dark web."). Law enforcement agents recovered numerous handwritten notes from White's motel room relating to drug orders submitted over the dark web, including at least one set of instructions for how to log on to the conspiracy's dark web accounts. Ex. 6. On the same piece of paper containing these instructions, the words "my number" were written directly above the number 480-313-5693. Ex. 6. Other records recovered from the motel room indicate that this phone number belonged to White. Ex. 7. The implication of this paper trail is that White wrote down instructions for how to log on to the dark web accounts he and McCoy were using to sell narcotics. Hence, White's contention that there is no evidence he accessed the internet to further the conspiracy is inaccurate. *See* Def.'s Objs. at 4.

### 3. White Misreads U.S.S.G. § 2D1.1(b)(7).

White's objection to this Guidelines enhancement misunderstands the application note to U.S.S.G. § 2D1.1(b)(7). Under White's reading of the enhancement's application note, the only person in a dark web drug conspiracy who could receive the enhancement would be a defendant who actually sits at a computer screen and posts drugs for sale. *See* Def.'s Objs. at 4 ("Under the use note, there is no basis on which to hold Mr. White accountable for Arnold's actions. There is no evidence Mr. White used the computers or the internet at all."). This would nullify the clear language of the enhancement, which applies by its terms to any "person for whose conduct the defendant is accountable under § 1B1.3 (Relevant Conduct)." U.S.S.G. § 2D1.1(b)(7). The Court can and should avoid a construction of this Guidelines enhancement that ignores its clear text.

White's objection to this enhancement also incorrectly characterizes the application note to U.S.S.G. § 2D1.1(b)(7).  *See* Def.'s Objs. at 4 (highlighting that the enhancement would apply to a defendant selling GHB on the internet but "would not apply to coconspirators who use an interactive computer service only to communicate with one another in furtherance of the offense").  White's objection assumes that the hypothetical coconspirators referred to in this application note are part of the same criminal conspiracy as the defendant selling GHB online.  Hence, White reads this application note as instructing that in a three-person conspiracy where Defendant 1 posts drugs online and Defendants 2 and 3 communicate with each other about the conspiracy using cellular phones, only Defendant 1's offense level may be enhanced under U.S.S.G. § 2D1.1(b)(7).  *See* Def.'s Objs. at 4.

A more reasonable reading of this application note is that the hypothetical coconspirators using an interactive computer service to communicate with one another are not involved in the same joint criminal activity as the GHB-selling defendant.  Under this interpretation of this application note, Defendant 1 is a single defendant selling controlled substances online.  Defendants 2 and 3, meanwhile, are involved in a completely separate drug conspiracy not connected to Defendant 1's actions, in which the only technology used to facilitate the conspiracy is the interactive computer service Defendants 2 and 3 use to communicate with one another.  This reading of the application note to U.S.S.G. § 2D1.1(b)(7) makes sense because that application note does not discuss or even mention the applicability of the relevant conduct provision at U.S.S.G. § 1B1.13.  Hence, under this interpretation, Defendant 1 would receive a two-level enhancement for using a mass-marketing computer service while Defendants 2 and 3 would not, and there would be no reason to analyze whether Defendants 2 and 3 should be held accountable for Defendant 1's conduct because they are not involved in jointly undertaken criminal activity in the first place.  Whereas, under White's reading of the application note, Defendants 2 and 3 are absolved of responsibility for Defendant 1's use of the internet without any discussion of the relevant conduct provision at U.S.S.G. § 1B1.13, even though the Guidelines state that courts must consider relevant conduct when applying U.S.S.G. § 2D1.1(b)(7).

The Court should overrule White's objection to the PSR's application of U.S.S.G. § 2D1.1(b)(7) because his objection is not consistent with the facts of this case or with the most logical reading of the Guidelines.

## C.    White Is Not Entitled to a Minor Role Reduction.

The Court should overrule White's objection to not receiving a minor role reduction in the PSR. *See* Def.'s Objs. at 5.  White was more than a simple drug courier—he made multiple deliveries of narcotics, recruited others to the operation, enjoyed access to its financial resources, and helped set up accounts to receive payments for its drugs.

### 1.    White Bears the Burden of Showing That He Is Substantially Less Culpable Than His Co-Participants.

White is only entitled to a minor role reduction if he qualifies as "a defendant who plays a part in committing the offense that makes him substantially less culpable than the average participant in the criminal activity."  U.S.S.G. § 3B1.2 cmt. n.3.  "It is not enough that a defendant was less culpable than his or her co-participants, or even that he or she was among the least culpable of the group, because a minimal or minor participant adjustment under § 3B1.2 is available only if the defendant was 'substantially' less culpable than his or her co-participants."  *United States v. Cantrell*, 433 F.3d 1269, 1283 (9th Cir. 2006) (citing *United States v. Johnson*, 297 F.3d 845, 874 (9th Cir. 2002); *United States v. Benitez*, 34 F.3d 1489, 1497–98 (9th Cir. 1994)).  "The defendant has the burden of proving that he is entitled to a downward adjustment based on his role in the offense by a preponderance of the evidence."  *United States v. Davis*, 36 F.3d 1424, 1436 (9th Cir. 1994) (citing *United States v. Sanchez*, 908 F.2d 1443, 1449 (9th Cir. 1990)).

Deciding whether to apply a minor role reduction is a fact-specific inquiry in which a court can consider "the degree to which the defendant understood the scope and structure of the criminal activity," "the degree to which the defendant participated in planning or organizing the criminal activity," "the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority," "the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts," and "the degree to which the defendant stood to benefit from the criminal activity."  U.S.S.G. § 3B1.2 cmt. n.3.  Under this analysis, a defendant seeking a minor role reduction for acting as a mere drug courier generally does not qualify "where some *additional* factor showing that they were not a minor or minimal participant[] exist[s]."  *Davis*, 36 F.3d at 1436–37.  For

instance, a defendant is not entitled to a minor role reduction where he ferried drugs multiple times for the same organization. *Cantrell*, 433 F.3d at 1283; *United States v. Palomino*, 730 F. App'x 485, 486 (9th Cir. 2018) (upholding district court's "decision to deny the minor role reduction in light of Palomino's six prior successful drug crossings and the large amount of methamphetamine" involved). Similarly, "possession of a substantial amount of narcotics is grounds for refusing to grant a sentence reduction." *United States v. Lui*, 941 F.2d 844, 849 (9th Cir. 1991). And where a defendant's compensation is dependent on the enterprise's performance—as opposed to a fixed fee—that also cuts against a minor role reduction. *See United States v. Diaz*, 884 F.3d 911, 917 (9th Cir. 2018) (reasoning that financial interest cut in favor of minor role reduction where defendant was set "to receive a set fee of $1,000 and had no ownership interest or other stake in the outcome of the trafficking operation").

### 2. Multiple Factors Demonstrate That White Was More Than a Courier.

The facts demonstrate that White was not simply a courier entitled to a minor role reduction, because there are multiple additional factors showing that he was a central contributor to the operation. *See Davis*, 36 F.3d at 1436–37 (holding that defendants are not entitled to minor role reductions "where some *additional* factor showing that they were not a minor or minimal participant[] exist[s]").

First, there is no dispute that the criminal enterprise of which White was a part dealt in substantial amounts of narcotics. *See* PSR ¶¶ 8 (detailing how White and McCoy purchased hundreds of dollars' worth of stamps to use for mailing drugs), 27 (calculating weight of narcotics found in White's motel room to be over 1,500 kilograms of converted drug weight). This straightforward fact cuts against granting White a reduction for a minor role in the offense. *See Lui*, 941 F.2d at 849.

Second, the evidence suggests that White made multiple deliveries during his time working with Arnold and McCoy. He spent hundreds of dollars on stamps which he used to send narcotics through the mail. PSR ¶ 8. Agents recovered numerous packages from his motel room that were processed for shipment. *See* Ex. 3. Records seized in White's motel room underscore that he and McCoy processed a significant number of transactions and shipments. Ex. 1 at 10 (noting that agents recovered "Notebook containing customer order information"); Exs. 8–10 (containing contents of one recovered notebook). This is not a case where White made a single, isolated drug delivery, and this fact weighs against granting him a minor role reduction. *See Cantrell*, 433 F.3d at 1283; *Palomino*, 730 F. App'x at 486.

Third, White exercised discretion and had a financial stake in the conspiracy's performance. White admitted that he coordinated directly with the conspiracy's drug supplier. PSR ¶ 16. The conspiracy used a Coinbase account in White's name to receive and transfer the proceeds of its illegal drug sales. PSR ¶ 11 (noting that more than $54,000 flowed from White's Coinbase account during a six-week period). White also used his traditional Bank of America account for this purpose and kept some of the operation's proceeds for himself. PSR ¶¶ 11, 17. "The conspirators split the profits" they made off their drug distribution. PSR ¶ 29. This is not a case where White received a set fee for his services—the more drugs sold on the dark web, the more money he made directly and the more money he could skim off the top of his bank account once he converted cryptocurrency to fiat currency. *See* PSR ¶ 17; *Diaz*, 884 F.3d at 917.

Fourth, McCoy joined the conspiracy because of White. PSR ¶ 20. As White himself indicates, McCoy was new to the Arizona area and knew very few people in the region where she and White were operating. Def.'s Objs. at 1 ("McCoy was from out of state and knew virtually no one in the area."). White, on the other hand, knew Arnold previously from prison. PSR ¶ 20. McCoy and White were living together in a small motel room with no walls separating the two available beds, which suggests that they were romantically involved. Def.'s Objs. at 1 (stating that "White and McCoy lived at the hotel"). Piecing these facts together leads to the reasonable conclusion that the PSR is correct when it states that White joined the operation through his relationship with Arnold, and that White subsequently brought his girlfriend McCoy on board. PSR ¶ 20 ("Arnold taught White how to take and process drug orders over the dark web. White then recruited McCoy and taught her how to facilitate orders as well.").

In this case, at least the four additional factors described above show that White was not a mere drug courier. *See Davis*, 36 F.3d at 1436–37 (holding that defendants are not entitled to minor role reductions "where some *additional* factor showing that they were not a minor or minimal participant[] exist[s]"). White may not have been the leader of the conspiracy, but he was nonetheless integral to its success. Accordingly, the Court should deny White's request for a minor role reduction. *See Cantrell*, 433 F.3d at 1283 (noting that "a minimal or minor participant adjustment under § 3B1.2 is available only if the defendant was 'substantially' less culpable than his or her co-participants").

///

### D.    The PSR Accurately Calculated White's Criminal History.

The Court should overrule White's objection to his criminal history calculation.  PSR ¶ 45.

The government agrees with the probation officer's rationale for adding a point to White's criminal history calculation based on his two 1997 convictions for Arizona armed robbery.  *See* ECF No. 183-4 at 2–3.  White's two convictions for armed robbery may have been part of a single crime spree that resulted in a woman's death, but that makes no difference to whether the application of U.S.S.G. § 4A1.1(e) is proper.  ECF No. 183-4 at 2–3 ("It is irrelevant that the convictions are treated as a single sentence or that they were a part of a single crime spree.  Instead, the relevant issue is whether he received two or more sentences for prior sentences for crimes of violence that were treated as a single sentence.").  Because Arizona armed robbery is a crime of violence under the Guidelines, the PSR appropriately added an additional point to White's criminal history based on his two prior convictions for armed robbery.  *See United States v. Molinar*, 881 F.3d 1064, 1070 (9th Cir. 2017) ("We conclude that Arizona Robbery (and thus armed robbery) is a categorical match to generic robbery, and that Arizona attempt is equivalent to generic attempt, so Molinar's conviction does constitute a crime of violence for purposes of Section 4B1.2.").

### E.    The Court Need Not Resolve White's Objection to His Aryan Brotherhood Status.

White objects to the PSR's statements relating to his relationship with the Aryan Brotherhood. *See* PSR ¶¶ 45, 63.  The Court should either decline to rule on this objection or else overrule it because the PSR's conclusion regarding White's gang affiliation is supported by a preponderance of the evidence.  *See United States v. Riley*, 335 F.3d 919, 925 (9th Cir. 2003) ("Generally, factual findings underlying sentence enhancements must be supported by a preponderance of the evidence.").

As a threshold matter, the Court need not rule on this objection so long as White's status with that gang does not affect the Court's sentencing determination.  *United States v. Saeteurn*, 504 F.3d 1175, 1180 (9th Cir. 2007) ("Rule 32 does *not* require the sentencing judge to resolve disputes that affect only the manner and location of service of the sentence, and not the term imposed.").  The government's position is that White's membership in the Aryan Brotherhood is immaterial to the 135-month sentence the government believes is appropriate.  Accordingly, the government does not believe that the Court must resolve White's objection to his Aryan Brotherhood status.

Should White's purported gang affiliation affect the Court's sentencing analysis, however, the government's position is that the facts in the PSR should be adopted. There are more facts in the record indicating that White was or is affiliated with the Aryan Brotherhood than supporting the opposite conclusion. *See Riley*, 335 F.3d at 925. Those facts include records received from the Arizona Department of Corrections, White's at-best ambiguous statements during his post-arrest interview regarding his gang status, and the fact that White's coconspirator was a longtime Aryan Brotherhood member. PSR ¶¶ 19, 45, 63. White cites no actual evidence to the contrary outside of his simple denial that he is or was affiliated with that gang.

## II. GOVERNMENT'S SENTENCING RECOMMENDATION

The government recommends that the Court sentence White to 135 months imprisonment on each of Counts 4 and 5, to be served concurrently. The government also recommends that the Court sentence White to three years of supervised release. This low-end sentence would achieve the purposes of federal sentencing by accounting for White's serious criminal conduct in this case, his criminal history, and the need to protect the public from further crimes he may commit. *See* 18 U.S.C. § 3553(a).

### A. The Nature and Circumstances of White's Offense Were Serious.

White played an important part in a criminal conspiracy to distribute heroin, cocaine, and methamphetamine on the dark web. He processed orders and shipped these controlled substances through the mail. PSR ¶ 8. He worked directly with the conspiracy's source of supply. PSR ¶ 16. He involved others in his offense by recruiting his girlfriend to join the conspiracy. PSR ¶ 20. Most concerningly, White and his coconspirators knew that what they were doing was illegal and wrong, because they took pains to conceal their activities in the hidden online world of the dark web and behind a façade of references to candy. PSR ¶ 8.

The Arnold-White-McCoy narcotics distribution operation was significant. In a little over six weeks in late 2018, White alone cleared more than $54,000 in cryptocurrency proceeds through his Coinbase and Bank of America accounts. PSR ¶ 11. Over roughly the same time period, McCoy cleared over $61,000 in cryptocurrency proceeds.[2] PSR ¶ 12. Agents executing a search warrant at

---

[2] The evidence suggests that McCoy never would have involved herself in the conspiracy if not for White's influence. PSR ¶ 29.

White's motel room recovered 315 grams of heroin, 45 grams of cocaine, more than half a kilogram of methamphetamine, 30 grams of marijuana, and a firearm that was both loaded and unregistered. PSR ¶ 15. They seized laptops, cellular phones, scales, multiple packages of drugs readied for shipment, and ledgers documenting hundreds of transactions which demonstrated the scope and scale of the conspiracy's reach. *See* Ex. 1.

A low-end sentence of 135 months in prison would appropriately account for the amount of drugs White and his co-conspirators distributed, the hidden online manner in which they did so, and the presence of a firearm in the same location as dangerous narcotics.

**B.** **White's History and Characteristics Support a 135-Month Sentence.**

A sentence of 135 months imprisonment is needed to account for White's troubling history and characteristics. 18 U.S.C. § 3553(a)(1).

1. White's Criminal History Is Concerning.

The severity of White's criminal history speaks for itself. He was convicted of felony theft involving a firearm when he was just nineteen years old. PSR ¶ 43. He picked up another theft conviction—this one relatively minor—a few years later. PSR ¶ 44. Then when he was twenty-eight, White and three other co-conspirators committed a series of armed robberies that culminated in a woman's death after she was shot in the neck. PSR ¶ 45. White adjusted poorly to his deservedly long prison sentence for this crime, committing over twenty disciplinary violations during his two-decade stay in state custody. PSR ¶ 45. White was also convicted of attempting to promote prison contraband while incarcerated for his robbery convictions. PSR ¶ 46.

This criminal history indicates that White is a dangerous person who, despite now being middle-aged, has not yet learned how to live a law-abiding life. What is even more concerning about White's history is that even after serving a two-decade sentence in state prison, he almost immediately resorted to criminal conduct upon his release by joining Arnold's dark web drug distribution conspiracy. PSR at 24 ("Within two months of being released from prison after serving approximately 21 years for armed robbery convictions, which involved the death of a woman, the defendant became involved in the instant offense."). Rather than take the opportunity afforded him to rebuild his life after so many years in prison, White reverted to his old ways and began breaking the law once again.

### 2. White's Addiction Does Not Absolve Him.

White suggests that his own drug addiction is at least partly to blame for his conduct in this case. Def.'s Objs. at 7; PSR ¶ 23. This may very well be true, but it does not absolve White of culpability for his offense. If anything, White's own struggles with heroin addiction should have motivated him to avoid dragging others down to his level by selling and sending them the very substance that continues to paralyze his own life. *See* PSR ¶¶ 6, 23. White's own heroin addiction is unfortunate, but his choice to maintain others' drug addictions is a crime that merits a stiff sentence. A 135-month sentence is sufficient, but not greater than necessary, to send the message that addiction is a problem that affects not just White but his customers as well.

### C. A 135-Month Sentence Is Sufficient Deterrent and Would Protect the Public.

Given White's criminal history and the indications that he learned few lessons about following the 8law from his last stint in custody, a 135-month sentence is needed to deter White and protect the public from his criminal tendencies. *See* 18 U.S.C. § 3553(a)(2). Indeed, 135 months represents a measured deterrent because it would keep White out of the community for just over half as much time as his prior state sentence did. PSR ¶ 45. A sentence of 135 months would strike the right balance by incapacitating White from committing new crimes for a significant amount of time, but an amount that is still far less than what White could theoretically have received based on his conduct and criminal history. PSR at 24 (noting that White's conviction exposed him to up to twenty years incarceration, with a Guideline range of up to 168 months).

### III.    CONCLUSION

The Court should reject White's objections to the PSR and sentence him to 135 months imprisonment with three years of supervision to follow.

Dated: February 10, 2022                    PHILLIP A. TALBERT
                                            United States Attorney


                                    By:  /s/ SAM STEFANKI
                                         SAM STEFANKI
                                         Assistant United States Attorney